Alexander Del Giorno, J.
These two claims had been originally tried together at a term of the Court of Claims in New York City on the 29th day of October and the 3rd and 4th days of November, 1954. The court awarded to claimant a judgment in the sum of $12,500 plus interest. Both sides appealed to the Appellate Division, Third Department, which reversed the judgment of the court on the law and the facts, with costs to abide the event. (3 A D 2d 326.) Subsequently, and on the 30th day of October, 1957, the case was submitted to this court on certain agreed parts of the printed record on appeal, with some additional testimony taken before the court of Messrs. Isadore Goldsand and Herbert K. Morrell for the claimant, and Harry K. Keller, for the State. These were the realty experts used by the parties on the first trial. There were no exhibits submitted to the court, as it was explained by the assistant attorney-general that they had been somehow lost or misplaced. Copies of the maps of the Robinson property were furnished to the court for its guidance.
The claims have not been assigned. The court has viewed the property.
These claims were tried together, and are for the permanent appropriation of 2.38 acres hy the State of New York, for the *909 purpose of the Taconic State Parkway, pursuant to the provisions of section 676-a of the Conservation Law of the State of New York, designated as “ Taconic State Parkway, Underhill Road Grade Separation, Proposal No. 2-R, Homer W. Robinson, Town of Yorktown, Westchester County, N. Y.” and for the permanent appropriation by the State of two rights of way and easements 20 feet wide from the Taconic Parkway into claimant’s land, designated as “ Taconic Bear Mt. State Parkway, Proposal No. 23, Homer W. Robinson, Town of Yorktown, Westchester County, N. Y.”
The maps and description of the two appropriations were filed in the office of the Clerk of Westchester County on May 15, 1951. The notice of appropriation concerning the taking of the two easements was served upon the claimant on May 29, 1951, and the notice concerning the 2.38 acres taken was served upon the claimant on June 6, 1951. The respective claims herein were filed with the Clerk of the Court of Claims and with the Attorney-General on May 14, 1953.
In any reference to the record, the court will refer to folios in the printed record and to pages in the typewritten record made before me.
The testimony of various witnesses and my personal viewing of the property confirm the fact that it is unimproved land, wooded throughout, generally rugged, with various elevations, beginning at its west boundary at the Parkway and continuing upward to its eastern boundaries. Beginning at the Parkway and for some 100 feet easterly (mostly State’s right of way) there is a small brook bounded by wet land. For some 400-500 feet east of the wet lands the ground rises gently at a possible grade of perhaps 4%. Proceeding again easterly towards its eastern boundary the land presents a general steeper rise, with a particular portion of some 7 acres towards the northeast sector rising abruptly from the general level rise. In the opinion of this court, the latter portion may not be used for a housing development. However, the court believes that the balance of claimant’s land by the use of bulldozers and other mechanical equipment available these days, may be properly cleaned of growth, scraped, leveled, banked and otherwise made usable for a housing development, with some exceptions, perhaps, in some spots.
The general topography in that entire area east and west of the Parkway is generally rugged but attractive. West of the Parkway the ground is more level with the grades of the adjoining roadways. It appears to the court that a house or a *910 housing development is more desirable and most likely less costly west of the Parkway, and since the land is less hilly it would be generally easier to keep up and cultivate. For these reasons the court is of the opinion that the values of land west of the Parkway were generally higher than would be claimant’s. However, the court agrees that the highest and best use of claimant’s land was for a housing development.
Thus, on the date of taking the claimant owned the land which consisted of 145 acres. On this land there were two easements running through and over State lands adjoining the Taconic Parkway for passenger vehicles only, connecting claimant’s land to the Parkway. These were reserved to the claimant’s land on a previous taking by the State for parkway purposes and were to be of 20 feet width. The location of the easements was to be approved by the Taconic State Park Commission. Nothing was done concerning the location or building of the said easements up to the time of their extinguishment by the State.
Before the taking, the claimant’s land had a frontage of 1,744 feet on the Taconic Parkway and about 355 feet on Underhill Road. The latter road could be used by all types of vehicles, while the Parkway was restricted to pleasure vehicles only. The Underhill Road frontage was the real jugular vein of claimant’s land. It alone could be used for all the needs of a possible housing development, while the easements, although of value, would be restricted in their use.
The State took the entire Underhill Road frontage in connection with the bridge it built continuing that road over the Parkway. This court was quite surprised upon its viewing of the property that the State saw fit to take all that frontage. Both by use of his own automobile as well as visual observation, the court concluded that the State could easily have left to the claimant at least 50 feet of the frontage on the extreme easterly portion thereof adjoining the Harper property. It is the court’s opinion that this would not in any way interfere with the free movement of traffic coming off the Parkway into the Underhill Road or vice versa. These 50 feet could have been used as the main entrance and exit road of claimant’s property, and could have been properly dedicated to the Town of Yorktown Heights in conjunction with any housing development. These takings completely landlocked the claimant’s property. It may be argued that he possesses an easement of necessity into Underhill Road. That is but small comfort, for it is subject to the whims and wishes of the State. It would hardly be an asset in a sale of the property.
*911 The parties agreed that the acreage originally was 145 acres. The State took 2.38 acres, but the balance was considered in round numbers as 142 acres. Considering the theory of appraising adopted in the first trial and the one adopted at this trial, and also some difference in testimony, which is to be expected, the court, nevertheless, has been able to set down the various evaluations of damage given by the experts for both sides. Mr. Goldsand gave a value for the 2.38 acres taken of $3,000; for the two easements, $2,500 each or a total of $5,000; and for the remaining 142 acres before the taking (based on the per acre value when the 145 acres were all together) $500 per acre or $71,000, and after the taking, $200 per acre or $28,400. He thus figured the consequential damage at $42,600. Mr. Morrell gave a value for the 2.38 acres taken of $2,500, and for the two easements, $5,000. The remaining 142 acres (using the same basis of value as Mr. Goldstand) he gave a before-the-taking value of $400 an acre or $56,800, and a value after the taking of $100 an acre, or $14,200. He thus figured the consequential damage at $42,600. Mr. Morrell’s testimony varied somewhat at pages 90-92 of the record, but the court feels that the values reported herein properly reflect his valuations and damages. Mr. Morrell gave it as his opinion for the difference of $300 an acre before and after the taking, that after the taking one could not build houses and display same on Underhill Road; that there was decreased visibility of the property because of its deep set back from Underhill Road; that the land now presented a drainage problem because the brook which takes off the drainage is mostly in the land taken by the State, to which he added the elimination of the easements. Mr. Goldsand asserted that the land as now constituted could be considered useful only to adjoining neighbors; and he gave a 50% damage to the property for the elimination of the easements. Mr. Keller, for the State, agreed that the claimant’s property was now landlocked and his appraisal was based on that premise. He gave a value of $500 to the easements because, he stated, they were good only for pleasure vehicles. He valued the 2.38 acres taken at $2,500. The land he valued in its original 145 acres at $250 per acre, or $36,250. He valued the remaining 142 acres at $50 per acre or $7,100. He gave his total figure of damage, both direct and consequential, at $29,150. He explained that the difference of $29,150 between the before- and after-valuation was the total he allowed to the claimant as damages, both direct and consequential.
The court is of the opinion that the following tables of all the experts’ evaluations of damages herein may clarify the *912 picture that each presented in his testimony. This is considered necessary because the various experts wandered far afield in their presentation of simple figures.
GOLDSAND
2.38 acres taken $ 3,000.
Basements 5,000
Value before taking:
142 acres at $500 per acre........$71,000
Value after taking:
■ 142 acres at $200 per acre........ 28,400
Consequential damage 42,600
Total damage $50,600
MORRELL
2.38 acres taken $ 2,500
Easements 5,000
Value before taking:
142 acres at $400 per acre........$56,800
Value after taking:
142 acres at $100 per acre........ 14,200
Consequential damage 42,600
Total damage $50,100
KELLER
2.38 acres taken $ 2,500
Easements 500
Value before taking:
145 acres at $250 per acre........$36,250
Value after taking:
142 acres at $50 per acre......... 7,100
Total damages, direct and
consequential $29,150
He explained that he did not consider the taking and consequential damages separately, although he explained that the total damage of $29,150 represented $500 for easements, $2,500 for 2.38 acres taken; severance damage $26,150.
Upon consideration of all the factors involved, including the fact that the land was carried on the tax rolls of the Town of Yorktown before the taking at the assessed value of $21,500, *913 the court is of the opinion that the value of the various items of damage was:
Direct taking of 2.38 acres $ 3,000
Value of the two easements 2,500
Value of 142 acres before the taking (when the property was together) at $300 per
acre ....................$42,600
Value of 142 acres after the taking at $100 per acre... 14,200 Consequential damage $28,400
Total damage $33,900
Therefore, the court computes the total damage sustained by the claimant at the sum of $33,900 with interest thereon from May 15, 1951 to November 15, 1951, and from May 14, 1953 to May 3, 1954, when interest was suspended by the court, and from October 29, 1954, the beginning of the first trial to the date of entry of judgment, for which judgment may be entered.
Findings have been passed upon and filed with this decision.
This represents the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.